# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## W. CONWAY SAUNDERS v. L. RAY TEMPLE.

June 12, 1930.

Absent, Campbell and Holt, JJ.

716

The opinion states the case.

*W. W. Beverly* and *Scott, Lloyd & Scott*, for the plaintiff in error.

*T. Justin Moore* and *Warren L. Tiller*, for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

This is an action for personal injury, in which the plaintiff below, Dr. L. Ray Temple, dentist, has recovered a substantial judgment against W. Conway Saunders, who is here assigning error and claiming that upon the evidence the court should have entered final judgrent in his favor.

The plaintiff, Temple, while walking northwardly on the boulevard about half way between the fair grounds bridge (over the tracks of the R. F. & P. R. Co.) and the Hermitage road, was struck by an automobile driven northwardly by Saunders. He was very seriously injured, his skull being fractured, apparently, from striking his head when he fell upon the concrete roadway. The boulevard is a street 100 feet wide, and at the place of the occurrence has a concrete bed twenty-seven feet wide covering the western portion of the

highway. The other part of the street on the east is a smooth dirt roadway and path. Automobiles are presumed to use the twenty-seven feet of concrete. The time of the injury was after dark, between six and seven o'clock, on Christmas eve, December 24, 1926.

The plaintiff, who lived in the section known as Dumbarton, had been in his own automobile, which was driven by his son, but as his son was in a hurry to reach home so as to return to the city later, the plaintiff alighted from his own automobile, and then went back a block to a drug store at the corner of Broad and Boulevard. He had determined to walk, say, a mile and a half or a mile and three-quarters, a part of the way to his home.

On the eastern unpaved side of the street in this section is the long fence enclosing the fair grounds, and there are very few buildings on the other, or western, side adjacent to the concrete. There was curbing on the west side of the concrete, but no sidewalk, and the place reserved for the sidewalk was much incumbered by debris, and was unfit for use by pedestrains. There were arc street lights 350 to 400 feet apart on the west side of the street. It had been raining, and the night was dark and misty.

The defendant denied any negligence, alleged the contributory negligence of the plaintiff as a bar to his action, relying upon the facts shown and upon the statute as it then was, paragraph 73 of section 2145 of the Code, as amended, Acts 1926, page 789, chapter 474, which reads:

"(h) Pedestrians shall not use the highways other than the sidewalks thereof for travel except when obliged to do so by the absence of sidewalks reasonably suitable and passable for their use, in which case they shall keep as near as is reasonably possible to the extreme left side or edge of the same."

No one save the plaintiff and the defendant was at the scene at the precise moment of the occurrence. The plaintiff in his testimony thus describes it: "* * * my idea of the State law was a pedestrian should walk on the side of the road facing traffic, and that being in my mind, I took the left hand side of the road and maybe possibly wasn't near the curb. It had been raining and there was some water and mud or something and I possibly was maybe two or three feet from the center of the concrete on the left side going north." And then this:

"Q. Of the paved part of the road?

"A. Of the paved part of the road.

"Q. Was the dirt and gravel part of the road toward the east in good condition, or bad condition, or what?

"A. Well, it was muddy I suspicioned because it had been raining and I didn't think of that side of the road. My thought was that I was on the right side, taking the left hand side of the road so if anybody was coming to me I could see them and wouldn't run any risk and be under the lights which are on that side of the road.

"Q. Did you walk zig-zag, straight, or how?

"A Straight ahead. I don't say I was in the center—possibly nearer the center of the concrete than I was the curb on account of the mud and water that was nearest to the curb."

And later:

"Q. Have you traveled the road there from time to time before that?

"A. Oh, yes, sir.

"Q. You are familiar with that road?

"A. Yes, sir.

"Q. You say you were just walking along in the regular way?

"A. Walking along in the regular way, I should say about 150 feet, or 150 yards rather, south of what was the Virginia Carolina Rubber Company then, and all at once I was struck, and since then I have no memory.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. Which way were you facing when you were struck?

"A. North.

"Q. From what direction were you struck?

"A. Right side, on my right side.

"Q. While you were facing north?

"A. While I was facing north I was struck from behind.

"Q. But on your right side?

"A. On my right side.

"Q. Some object from behind?

"A. Yes."

Is is shown by a photograph that his right leg had scars or marks upon it on the calf, about half way between the instep and the knee. He said that he could see all right; that he thought he was in a safe place; that he did not hear any warning that any vehicle was approaching from behind; that his hearing was good, and that after he was struck he was unconscious for two weeks. It is shown that he was irrational, confused and irresponsible when he regained consciousness for about a month, and completely incapacitated to resume his work for three and one-half months, and is still partially disabled.

Upon cross-examination as to the precise place of the occurrence, he testifies thus:

"Q. What portion of the concrete were you walking on at that time—how far from the center line?

"A. Possibly three or four feet, just a short distance in. Nearest the curb it was wet as my shoes indicate

and I was traveling towards the center rather than towards the curb.

"Q. You were bearing toward the center?

"A. Yes, sir."

And again:

"Q. When you were hit your idea is that you were about two or three feet from the center line?

"A. Something like that, or possibly three or four. It might have been a yard.

"Q. We will say from four feet to two. I don't care.

"A. It might have been right in the center. I might have been on the black line, as far as that is concerned.

"Q. You might have been on the line? You don't know where you were walking?

"A. On the west side right close to it. I was on my side.

"Q. That is a question we will come to later. You were on the west half of the concrete close to the line, within four feet of it?

"A. On the west side of the concrete close to the center line.

"Q. That is where you were walking?

"A. The feet are not designated—close to the west side, the west side of the concrete close to the center line." He repeats that he was struck on the right side.

If this were true, he would necessarily have been thrown to or towards the left or west side, but the fact is that he was found on the extreme right or east edge of the concrete roadway.

It is upon this evidence that the plaintiff must recover, if at all.

When the plaintiff was about to rest his case, one of the attorneys for the defendant asked that the jury be

excused so that a motion might be made in their absence; and thereupon this was said by one of the attorneys for the plaintiff: "Before we close our case, we want to make perfectly clear our position on one point so there can be no possible misunderstanding between us. We assume that the defendant will call Mr. Saunders to testify. Unless he is willing to assure us that he will do that, we propose to call him as an adverse witness because we do wish to cross-examine him in any event." After some further colloquy, the plaintiff called the adverse party, the defendant, as a witness to cross-examine him, a right accorded by statute, Code, section 6214.

This witness, the defendant, Saunders, describes his movements immediately prior to the accident, testifying that at the time he was traveling between fifteen and twenty miles an hour, except at cross streets; that he had no speedometer, but that it was necessary for him to drive carefully on account of the weather conditions which existed; that he was keeping a vigilant lookout and driving carefully; that it was misty but not raining---very cloudy and misty; that he could stop the car in fifteen feet, and that when he first saw Temple he was not over four feet from him. Then he says this:

"Q. Did you really see him before you struck him at all?

"A. I saw him as he stepped out in front of the car. It was instantaneous, the sight of Dr. Temple and my accident with him were almost simultaneous.

"Q. So that you really can't say you saw him at all before the accident?

"A. The only thing I can say that I saw him just as he appeared."

In answer to the question: "Where were you driving with reference to this paved part of the Boulevard?" He

said: "I was about two feet from the right hand edge or eastern edge of the concrete part of the roadway." And further:

"Q. How short a space did you actually stop in?

"A. In fifteen feet of where I hit Dr. Temple or less. I didn't measure it but it wasn't more than the length of the car.

"Q. Where was Dr. Temple after the accident?

"A. Laying on the right hand side of the concrete, just in the edge of the dirt part of the road. * * *

"Q. The first you saw of Dr. Temple, as I understand it, was just as his body appeared about two feet inside of the concrete ahead of you?

"A. Right on a line of my wheel or my lamp, because the lamp of my car struck Dr. Temple, the right hand lamp of my car." He states that Temple's back was toward him.

"Q. And you say he was walking possibly two feet inside on the concrete?

"A. I don't know where he was walking, Mr. Moore. I didn't see him until he got in the line of my vision, right in front of my car, about four feet of me."

In answer to the question: "Can you give the jury any explanation as to why you didn't see the man until you actually struck him?" He replied: "Because he was out of the line of my vision to my right—must have been and I could'nt see him until he got within the line of my vision."

"Q. It is a matter of inference or argument as to how he got there but you have stated that to be a fact?

"A. That is absolutely a fact. I reiterate it, that I didn't see Dr. Temple until I was in four feet of him, and the impact was almost instantaneous. It was almost instantaneous. That was absolutely a fact, sir."

He testified that his headlights were good, but he had

the dimmers on because it is not lawful to drive with bright headlights on in the city. In answer to the question as to how far he could see, he said: "I should say you could see, well, from here to that door. I believe that is as far as you could see plainly with dimmers on your car, and in addition to that, Mr. Moore, the other side of that road was full of cars and everybody that drives a car knows that with the lights on many cars passing by you will obstruct your view in looking the other way." When asked how many cars passed, he said: "I couldn't tell you. It would be a guess if I was to tell you but they were coming constantly all the time as they do now. It is a very much used road, constantly coming." In answer to the question: "You can't give the jury any explanation as to why you didn't see this man at all, can you?" He replied: "Absolutely I can, because he was not in the line of my vision. He stepped suddenly out in front of my car and the only thing I can tell you, just as it happened he was in four feet of me when I saw him." He repeats that the road was full of cars on the other half of the concrete coming towards Richmond, and that it wasn't different on that night from other nights except that the weather was different.

It is perfectly apparent from his own testimony that the plaintiff was guilty of contributory negligence. It may be that it might not be gross negligence to walk in the daytime near the center line of such a concrete roadway, so occupied by moving automobiles, but to walk there on a dark and misty night without heeding vehicles approaching from behind is certainly gross negligence as well as a violation of the statute which requires a pedestrian at all times to keep as near to the extreme left of the highway as is possible, so as to face and be able to see cars approaching from

the opposite direction, and be out of the way of cars on the right of the highway approaching from behind.

It must be conceded that the only question in the case is whether or not the plaintiff is entitled to recover upon the discovered peril, or last clear chance doctrine. In considering this, under the circumstances shown, we are not faced with a simple conflict in the testimony between the witnesses, because here the significant physical facts proved without contradition are decisive. The plaintiff himself states that his memory has since been defective, and that the physical facts show that he must have been mistaken both in thinking that he was walking on the west or left hand side of the concrete roadbed and that he was struck from his right. This seems to be certainly true because the evidence clearly shows that the lamp of the defendant's automobile, on its right side, was bent as a consequence of the impact. Several witnesses who reached the scene immediately after the accident testify that the plaintiff was lying unconscious upon the extreme right hand or east side of the concrete on its edge, with his body partly off the concrete roadway. There was a pool of blood found at this spot upon the extreme right hand or east side of the concrete roadway. The defendant's automobile was promptly stopped and found at rest within fifteen feet or less from the point of impact, and within two feet of the east edge of the concrete roadway. The physical facts shown in the case support, even if they do not indeed demonstrate, the fact that the plaintiff when struck was walking on the wrong or east side of the concrete roadway, and this was certainly the most dangerous place in which he could have possibly placed himself, and there is no contradiction of the defendant's evidence. The plaintiff certainly should not be permitted to recover unless he shows by a fair

preponderance of the entire evidence that the defendant should have discovered his peril and had the last clear chance to save him. There must be a clear chance, and it is insufficient to suggest a mere chance. The plaintiff's burden is to show to the impartial mind that the defendant in fact had the time and a clear opportunity to avoid injuring him. This burden he has failed to carry.

There is no reason for refusing to credit the defendant's testimony. Should we do so we could only guess or speculate as to whether the defendant was guilty of any actionable negligence. Whether he could or should have seen the plaintiff in time to save him depended upon many circumstances besides the street lights and the headlights on his own car, such as the lights thrown and the shadows cast by other cars, the changing lights and shadows, the background, and the plaintiff's clothing, whether dark or light, and the constantly changing conditions created by the movements of his own car and the plaintiff.

It may be doubted whether anything can be added of value to what has been so often said as to this discovered peril doctrine. We shall, therefore, content ourselves with citing some of the recent cases. *Norfolk & Western Ry. Co.* v. *Cromer,* 99 Va. 795, 40 S. E. 54; *Norfolk Southern R. Co.* v. *White,* 117 Va. 342, 84 S. E. 646; *Washington, etc., R. Co.* v. *Thompson,* 136 Va. 606, 118 S. E. 76, 78; *Ashby* v. *Virginia Ry. & P. Co.,* 138 Va. 310, 122 S. E. 104; *Virginia Ry. & P. Co.* v. *Leland,* 143 Va. 925, 129 S. E. 700; *Norfolk Southern R. Co.* v. *Hudgins,* 150 Va. 229, 142 S. E. 412; *Norfolk & Western Ry. Co.* v. *Mace,* 151 Va. 469, 145 S. E. 362; *Virginia Elec. & Power Co.* v. *Jayne,* 151 Va. 701, 144 S. E. 638; *Ellison* v. *Hampton, etc., Ry. Co.* (March 13, 1930), 154 Va. 39, 152 S. E. 373.

■ The case is one which suggests repeating the statement made by Burks, J., in *Vandenbergh* v. *Buckingham Corporation*, 142 Va. 411, 128 S. E. 561, 564: "Perhaps, on a demurrer to the evidence, we might be compelled to accept Vandenbergh's statement of the waiver by Johnson, but not so under our present statute (Code, sections 6251 and 6363), when to do so would strain the credulity of the court to the breaking point, and require the entry of a judgment contradicted by every other fact and circumstance of the case, in conflict with the testimony of numerous witnesses of high character, and manifestly against right and justice. It is extreme cases of this sort that the statute was enacted to meet."

■■ To sustain this recovery upon the testimony of the plaintiff would be to sustain it merely because a tragic accident has occurred of which the plaintiff can neither give nor supply any clear account. The able attorney who conducted his case must have realized that a recovery could not be sustained upon this testimony unless some additional fact as to the occurrence could be obtained from the only other eye-witness, the defendant. With this in view, they examined him. While they may not be bound by such of his statements as may be in conflict with the evidence introduced on behalf of the plaintiff, they are bound, and the court and jury are bound, by so much of the clear, logical testimony of the defendant as is reasonable and uncontradicted. The difficulty which the court has in taking their view of the record as a whole is the same difficulty which they had before they attempted to extract some incriminating evidence from the defendant as a witness. That obstacle to recovery is a fundamental rule that the burden always rests upon the plaintiff to establish his case by the weight of the testimony. The defendant cannot be held responsible

for the negligence charged upon a bare "perhaps." It is not enough merely to show concurring negligence. There must be evidence sufficient to persuade the impartial mind of the defendant's actionable negligence, that is, in a case like this, evidence that the defendant had a clear opportunity to save the plaintiff from the consequences of his own negligence, after the defendant realized or should have realized the impending danger. This must be a fair deduction from the testimony. There is no such parol testimony in this case, and every physical fact about which there is no contradiction sustains the account of the occurrence which the defendant gives. In no aspect of the case, either upon the testimony of the plaintiff and his witnesses, upon the testimony of the defendant, or the existing circumstances and conditions can the verdict be sustained.

It follows that we are of opinion that the court erred in giving the instruction to the jury which permitted them to find that the defendant had the last clear chance to save the plaintiff from the consequences of his own negligence, because there is no testimony from which this can be fairly deduced.

There is other significant testimony unfavorable to the plaintiff's claim, but its significance is weakened by conflicting testimony and we deem any discussion of it unnecessary, because the other facts shown are decisive of the issue presented.

This conclusion makes it unnecessary to consider the other questions presented by the record—among them, consideration of some evidence discovered after the verdict, which if true tends to support the defendant's account of the occurrence.

The trial court should have set aside the verdict of the jury and entered final judgment for the defendant. Such a judgment will be entered here.

*Reversed.*